885 N.E.2d 603 (2008)
In re the Matter of the Termination of the Parent-Child Relationship of S.L.H.S., Minor Child, and Andrew Thompson, Father.
Andrew Thompson, Appellant-Respondent,
v.
Elkhart Office of Family and Children, Appellee-Petitioner.
No. 20A03-0707-JV-313.
Court of Appeals of Indiana.
March 31, 2008.
*606 Nancy A. McCaslin, McCaslin & McCaslin, Elkhart, IN, Attorney for Appellant.
Barry A. Chambers, Indiana Department of Child Services, Indianapolis, IN, Attorney for Appellee.

OPINION
KIRSCH, Judge.
Andrew T. ("Father") appeals the termination of his parental rights to S.L.H.S. Father raises three issues, which we restate as:
I. Whether the trial court lacked subject matter jurisdiction to hear the termination case;
II. Whether the trial court properly excluded certain evidence pertaining to Father's alleged Native American heritage and properly admitted evidence of Father's criminal history; and,
III. Whether the trial court's termination order was supported by clear and convincing evidence.
We affirm.

FACTS AND PROCEDURAL HISTORY[1]
On August 30, 2005, two-year-old S.L.H.S. was removed from his mother's care and placed in protective custody when, after nearly being struck by a car, he was found wandering in the streets of Goshen, Indiana, unsupervised. At the time of S.L.H.S.'s removal, Father was incarcerated at a work release center, also in Goshen, and had not had custody of S.L.H.S. for over a year. Prior to the proceedings to determine whether S.L.H.S. was a child in need of services ("CHINS"), the trial court approved protective *607 custody and placed S.L.H.S. in foster care on November 1, 2005. S.L.H.S. remained in foster care until the termination of parental rights hearing.
After S.L.H.S.'s removal, Mother informed the Elkhart County Department of Child Services ("ECDCS") that she belonged to an Indian tribe and that the Indian Child Welfare Act ("ICWA") applied to them. On October 3, 2005, Mother filed a petition for the return of S.L.H.S. claiming she and S.L.H.S. were members of the Northeastern Cherokee Band and that both parents were members of a Tribal Sovereign Nation. Father alleged that he was a member of the Muscogee Creek Nation. In response, the ECDCS contacted several Indian tribes both by phone and in writing and informed them of S.L.H.S.'s detention. The tribes were unable to verify S.L.H.S.'s membership in any Indian tribe.
The United States Department of Interior, Bureau of Indian Affairs acknowledged receipt of an inquiry from the ECDCS in which Mother was alleged to be a member of the Eastern Band of Cherokee Indians in Florida and Father claimed to be a part of the Chattahoochee Creek Nation and informed the ECDCS that the inquiry was being forwarded to the Cherokee Nation and Muscogee (Creek) Nation for a response. Other attempts to verify the parent's membership in an Indian tribe were also made by the ECDCS. S.L.H.S. was later determined not to be a member of the Cherokee Nation identified by Mother.
The trial court thereafter determined that the ECDCS had not violated the ICWA and on December 12, 2005, after substantiating a finding of neglect, the ECDCS filed a petition alleging S.L.H.S. to be a CHINS. On December 15, 2005, a hearing on the CHINS petition was held and both Mother and Father, who were represented by counsel, admitted to the allegations of the petition. The court adjudicated S.L.H.S. to be a CHINS and proceeded to enter a dispositional order compelling Mother and Father to complete certain services in order to achieve reunification with S.L.H.S.[2] On February 23, 2006, the court modified Father's dispositional order to include an order directing Father to complete any recommendations resulting from the psychological evaluation, which Father had previously agreed to complete.
At the termination hearing, testimony was admitted showing that prior to the August 30, 2005 neglect referral that initiated the underlying cause, Father had a prior substantiated case of molestation dating from 1992 for molesting his stepdaughter. As a result of that referral, Father had been ordered by the court to leave the family home and to complete treatment; however, Father failed to complete treatment and moved to Florida. There was also testimony that Father had molested his niece, S.M., when she was under the age of ten, and his biological sister, D.R.
Evidence at the fact-finding hearing further revealed that Father has five biological children, in addition to S.L.H.S. Father had supervised visitation with his two eldest children and was ordered to pay child support for all the children. Father failed to regularly visit with his other children and had a substantial arrearage, totaling thousands of dollars, in child support. Additionally, during a previous divorce case, Father asked the court *608 to terminate his parental rights to two of his older children.
On December 5, 2006, the ECDCS filed a petition to terminate Father's and Mother's parental rights to S.L.H.S. The ECDCS also notified various tribes and the Secretary of the Interior, via the Bureau of Indian Affairs, of the termination proceedings. On February 22, 2007, the trial court held an initial hearing on the termination petition. Father was aware of the hearing but failed to appear.
The fact-finding hearing on the termination petition commenced on May 18, and was concluded on June 4, 2007. On June 7, 2007, the trial court entered a judgment terminating both Father's and Mother's parental rights to S.L.H.S. In so doing, the trial court made extensive and detailed findings, which provide, in pertinent part, as follows:
I. Jurisdiction
The propriety of jurisdiction has been raised and addressed repeatedly throughout the instant case, and it has been raised and addressed throughout the related CHINS case that preceded this matter; the CHINS case has been ongoing since December 12, 2005. The father . . . contends that the proper jurisdiction in which to address his parental rights is a Native American Tribal court rather than the Elkhart Juvenile Court where it is filed. The jurisdictional issue was raised again during the Evidentiary Hearing on the Termination Petition.
* * *
At the close of evidence on the second day, the parties specifically addressed the issue of jurisdiction prior to making arguments on the substantive issues required by law for Termination of Parental Rights. Having heard the arguments of [the] parties on jurisdiction, and having reviewed the law, the Court finds it has jurisdiction over the parties and the subject matter in this case.
[Father's] counsel[] is correct in arguing that the Indian Child Welfare Act (ICWA) reflects a preference for a case involving an "Indian child" to be heard in a tribal court. . . . However, whether or not a child qualifies as an "Indian child" is not an arbitrary label assigned at the discretion of a parent; instead it is a legally defined designation spelled out by federal law. The Indian Child Welfare Act defines an "Indian child" at 25 U.S.C. § 1903(4) as the following:
"any unmarried person who is under the age of 18 and is either (a) a member of an Indian tribe or [b] is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." Id.

The law is quite clear, membership in a recognized tribe is an essential element if [S.L.H.S.] is to be considered an "Indian child" as contemplated by the Indian Child Welfare Act. While extensive efforts were made to present evidence to support a finding that [the] parents have some Native American ancestors, no evidence, whatsoever, was presented during two days of trial to support a finding that [S.L.H.S.] or either of his parents is a member of any recognized Indian tribe. Thus, [S.L.H.S.] is not an "Indian child" as this designation is defined by law. As such, the jurisdictional mandates that [Father] asks the Court to honor, simply do not apply in this case. The Court recognizes and notes that [Father] has expended tremendous efforts through hours of hard work attempting to track down his Native American heritage over the years; he reports that he began his search when he was only nine or ten years old. Despite the hard work, membership *609 in a recognized tribe has not been established. Likewise, while testimony was presented by [Father] that the grandmother of [Mother] . . . was a member of an Indian tribe, no evidence ever qualified for, or was awarded the same status.
In addition to the work expended by [Father], the [ECDCS] has contacted the Bureau of Indian Tribal Affairs, in Washington D.C., the Western Oklahoma Region in Muscogee, Oklahoma, the United Keetowah Band in Tahlequal, Oklahoma, the Area Director of the Bureau of Indian Affairs Minneapolis Area Office, the Eastern Band of the Cherokee Nation, the Muscogee (Creek) Nation, and the Poarch Band of the Creek Indians attempting to track down possible tribal status for [S.L.H.S.] or either of his parents. Signed receipts from certified mail sent by the [ECDCS] were admitted into evidence. Despite the extensive contacts made by [ECDCS], no tribal status has ever been identified for [S.L.H.S.] or either one of [his] parents.
For the reasons stated above, the Court finds no cause to transfer these proceedings. . . .
II. Termination of Parental Rights
* * *
In this case, the Court finds that it was established by clear and convincing evidence that the allegations of the Petition are true in that:
a. The child was removed from his parents' . . . home on August 30, 2005, when he was found wandering the streets in Goshen, unsupervised and was nearly struck by a car . . . [S.L.H.S.] has been removed from his parents . . . for twenty-one [21], of the most recent twenty-two [22], months
* * *
c. With respect to [Father], the court finds that there is [a] reasonable probability that the continuation of the parent[-]child relationship between [Father] and [S.L.H.S.] poses a threat to the well being of the child.
(1) While the court acknowledges that service providers all noted more of a bond between [S.L.H.S.] and his father than between mother and child, it must also recognize that the child has not lived with his father since he was a year old. The father was in Work Release when the child was removed from the family home, and had been in the Elkhart County Jail for a period of time prior to Work Release. Thus, [S.L.H.S.] has lived outside his father's care for nearly 75% of his young life.
(2) Additionally, [Father] has a history with his children that also indicates a threat to the well-being of [S.L.H.S.] if the child is placed in his father's care.
(3) [Father] has [a] total of six children . . . [and] three step[-]children. He has a history of substantiated abuse involving some of those children. On July 6, 1992, [Father] admitted that the stepdaughter who was at the time in his care, [E.R.], was a Child In Need of Service. A certified copy of the Court Order documenting the admission was entered into evidence. . . . Case manager Carrie Conder testified that in addition to the 1992 CHINS case, there was a substantiated case of medical neglect involving two of [Father's] children living in Florida.
(4) [Father] has a history of having failed to consistently pay child support for the benefit of his four older children. According to . . . Court documents . . . he is in arrears on support *610 to [C.T.] and [J.T.] in the amount of $16,800.00. . . . [Father] is also in arrears on support owed to [T.T.] and [S.T.] in the amount of $20,000.00. [Father's] commitment to his children is further undermined by a request he filed in Elkhart Circuit Court on January 19, 2005, and admitted into evidence . . . in which he asked that his parental rights relating to [T.T.] and [S.T.] be terminated.
(5) Case Manager Roger zum Felde described [Father's] follow through with scheduled visitations with [S.L.H.S.] as "sporadic." The Case Manager explained that [Father] has attended approximately 60% to 70% of the scheduled visits with his son.
(6) Mr. zum Felde testified that reunification between [Father] and his son is not possible because [Father] presents a continuing threat to the well-being of [S.L.H.S.]. Mr. zum Felde described a threat resulting from allegations of past abuse alleged against [Father], and [Father's] diagnosed delusional disorder, and his refusal to participate in treatment to address either of these concerns.
(7) [T]he 1992 CHINS . . . case . . . involved allegations that [Father] molested his step-daughter [E.R.]. The allegations were substantiated. [Father], while admitting that his stepdaughter was a CHINS, has always denied the allegations of abuse. Nonetheless he was ordered to participate in treatment. He refused, [and] instead of being involved in treatment [Father] moved away from his family.
* * *
(9) In further support of a finding of risk posed by previous allegations of abuse, three witnesses testified that they had been victims of [Father] when they were children. [E.R.], who is now a 25-year-old college student testified that her former step-father [Father] molested her repeatedly as a child. She testified that he had touched her breast, and bottom, and on one occasion placed his finger in her vagina. [E.R.] stated that she finally told a school counselor about the abuse after watching a video on the subject at school when she was 11-years old. [E.R.'s] report of abuse resulted in the filing of a CHINS Petition. [S.M.] testified that [Father] is her uncle, specifically her mother's adopted brother. She testified that as a child, she remembers that [Father] would cover her mouth and put his hands in her pants. She filed a police report attesting to the accusations on December 30, 1992. The report was admitted into evidence. . . . Finally, [D.B.R.], [Father's] biological sister testified that she stopped visiting her brother when on a visit he sat on top of her, and fondled her breasts. Kim Varga, MSW, also expressed further concern over the fact that [Father] met [Mother] when she was ten years old and he was 31-years old, and he admits that he and [mother] began dating when [Mother] was only 14-years old. [Father] told Dr. Jay Shetler when the doctor was assigned to complete a Psychological Assessment on [Father] that [Mother] became his "girlfriend" at the age of 12-years old; later [Father] stated that she was actually 15 or 16-years old when they became involved in a relationship. In a letter sent by Dr. Shetler to the case manager on October 13, 2006 . . . addressing concerns over [Father's] relationship with [Mother], the doctor wrote, "[h]e also minimized the nature of the relationship when questioned about her age."

*611 (10) Because of concerns raised by prior allegations of sexual abuse against children, [Father] was ordered to complete a Psychosexual Assessment in this case and ordered to follow any resulting recommendations. The assessment . . . concluded that [Father] should be involved in sex offender specific treatment. Katy Byler, MSW, CSAT, SATP, completed the assessment. She testified, and during her testimony she expressed the concern that [Father] will pose a risk to children if he does not complete treatment.
(11) Marc Roth of Holy Cross Counseling testified that successful completion of a sex offender specific treatment does not demand an admission of guilt. Yet, [Father] attended just one treatment session and then he never returned. Mr. Roth opined that [Father's] risk to the children has not been mitigated, and Mr. Roth, therefore, recommends that any contact between [Father] and any children be supervised.
(12) Dr. Jay Shetler, PsyD, HSPP, completed a Psychological Assessment of [Father] which was admitted into evidence . . . it diagnosed [Father] with delusional disorder and schizotypal personality disorder traits. During testimony Dr. Shetler described [Father] as having "severe mental illness." Dr. Shetler stated that . . . [Father's] mental health could get in the way of his ability to parent. Following a second interview with [Father], Dr. Shetler wrote to case manager (Exhibit #17), and described [Father] as "[H]is thinking is unusual and he cannot connect facts in a logical sequence to support his conclusions and ideas." In Court the doctor opined that it would be very difficult for [Father] to parent without treatment.
(13) When asked about his willingness to be involved in treatment [Father] responded by stating simply that he didn't see it as being necessary.
(14) There is no doubt . . . that [Father] presented himself very well in Court. He was poised and well spoken. But while the Court recognizes [Father's] ability to explain himself in Court . . . his performance fails to overcome the overwhelming evidence that he suffers from mental illness that . . . poses a threat to the well-being of the child. Moreover, [Father] undermines his own credibility by putting forth conflicting stories in an attempt to explain his family's unflattering testimony further documenting [Father's] mental illness. . . .
(15) [Father's] adopted sister [M.M.] testified that she recalls her brother coming home from High School claiming that the FBI had "hauled him out of class for questioning"; the school denied the claims. On another occasion she stated that [Father] claimed the FBI had run him off the road, this too proved to be untrue. The former case manager, Carrie Conder, testified that [Father] had told her that the mother of the president of Mexico lived down the street from [Father] in Goshen, and the President would visit [Father] when he came to see his mother. [Father] told Ms. Conder that he was negotiating "top secret" employment with other countries, and had negotiated agreements with Congress. . . .
(16) Carrie Conder testified that the stories told by [Father] concerned her because he believed them, and reality issues could undermind his ability to parent. Dr. Jay Shetler testified that *612 [Father's] delusions could lead him to make poor judgments and interfere with [Father's] ability to parent. Perhaps more important, Dr. Shetler expressed the opinion that [Father's] mental illness would pose a threat to the well-being of [S.L.H.S.], in that it could infect [S.L.H.S.] with a "fear of the world, transfer persecution delusions, and undermine the child's sense of safety." All of these things would be a threat to the well-being of the child.
d. It is in the best interests of [S.L.H.S.] that parental rights be terminated. [S.L.H.S.] was removed from his parents['] home on August 30, 2005, because his parents were unable to care for him. His parents are still unable to care for him. . . . [Father] is unable to care for [S.L.H.S.] because for him to do so would pose a threat to the well[-]being of the child. Yet at the age of four, [S.L.H.S.] needs a parent. He has been under the supervision of the [ECDCS] for half of his life, and it is time for him to move on. The CASA and [ECDCS] case manager both testified to the child's need for permanency if he is to become a healthy adult. Case manager Roger zum Felde stated that [S.L.H.S.] needs permanency and his parents have simply not demonstrated the ability to parent at this time.
Appellant's Br. at 51-55, 57-62. This appeal ensued.

DISCUSSION AND DECISION

I. Subject Matter Jurisdiction
Father contends that the trial court lacked subject-matter jurisdiction to hear the termination of parental rights case due to his alleged Native American heritage. In making this assertion, Father relies on the ICWA, 25 U.S.C. §§ 1901-1963 (1982).
The ICWA is structured around the concern that "an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies[.]" In re T.R.M., 525 N.E.2d 298, 302 (Ind.1988) (citing 25 U.S.C. § 1901(4)). In passing the ICWA, Congress has declared that the policy of this Nation is:
[T]o protect the best interest of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture. . . .
Id. (citing U.S.C. § 1902). Thus, the power of state courts to conduct termination proceedings involving children of Indian ancestry may be subject to significant limitations under the ICWA. In re T.R.M., 525 N.E.2d at 301.
Although a court, after a proper petition for transfer of the proceeding, is required to transfer to an Indian tribe's jurisdiction any proceeding to terminate the parental rights of an Indian child not domiciled or residing within the reservation of the Indian child's tribe, see 25 U.S.C. § 1911(b), availability of this right to transfer is contingent on the applicability of the ICWA to the proceeding sought to be transferred. Thus, the party who seeks to invoke a provision of the ICWA has the burden to show that the act applies in the proceeding. See In re J.L.M., 234 Neb. 381, 451 N.W.2d 377, 387 (1990).
Applicability of the ICWA depends on whether the proceedings to be transferred involve an "Indian child" within the *613 definition utilized in 25 U.S.C. § 1903(4). However, the trial court correctly pointed out in its judgment that whether or not a child is an Indian child for purposes of the ICWA is determined by federal law and is not an arbitrary label assigned at the discretion of the parent.
The ICWA defines an "Indian child" as "any unmarried person who is under the age of eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." 25 U.S.C. § 1903(4). The evidence most favorable to the trial court's judgment supports its finding that despite Father's "tremendous efforts through hours of hard work attempting to track down his Native American heritage[,]" and the extensive efforts of the ECDCS to track down any possible tribal status for S.L.H.S. or either parent via multiple letters and telephone calls to various Indian organizations, including the Bureau of Tribal Affairs in Washington D.C., the Western Oklahoma Region in Muscogee, Oklahoma, the United Keetowah Band in Tahlequal, Oklahoma, the Area Director of the Bureau of Indian Affairs Minneapolis Area Office, the Eastern Band of the Cherokee Nation, the Muscogee (Creek) Nation, and the Poarch Band of the Creek Indians, no tribal status for S.L.H.S. or either of his parents has ever been identified. In fact, a letter from the Director of the Cherokee Center For Family Services that was admitted into evidence specifically rejected Mother's allegation, contained in her October 3, 2005 petition to the trial court, that she and S.L.H.S. were members of the Eastern Band of Cherokee Indians, stating that "[S.L.H.S.] is not registered or eligible to be registered as a member of this tribe." Appellee's App. at 70. Because Father has failed to provide any evidence that S.L.H.S. is an Indian child within the purview of the ICWA, we conclude that the ICWA did not apply to the proceedings to terminate Father's parental rights to S.L.H.S.[3]
Father counters that, but for the trial court's erroneous decision denying his request "to open his adoption records to obtain medical information and locate his Native American tribal connections[,]" Appellant's Br. at 1, he would have the proof of his biological heritage that he needs to invoke the ICWA. The ECDCS disagrees, claiming Father "wrongly characterizes" the proceeding wherein he was unable to access his adoption records, because that event did not occur in the context of this termination action. Appellee's Br. at 17.
The record reveals that on April 15, 2005, approximately four months before S.L.H.S. was removed from his Mother's care and placed in protective custody, and almost two years before the ECDCS filed its termination petition in the underlying cause, the Elkhart Circuit Court, under a separate cause number, 20C01-0502-MI-6, held a hearing on a petition filed by Father for the release of medical information and identity pursuant to IC XX-XX-XX-X. At the conclusion of that hearing, the trial court denied Father's request because Father failed to follow statutory guidelines in requesting said information.[4]
Indiana Appellate Rule 9 states "[a] party initiates an appeal by filing a *614 Notice of Appeal with the trial court clerk within thirty (30) days after the entry of Final Judgment." In failing to file a timely appeal of the trial court's order denying his petition for release of medical information and identity, Father has waived any allegation of error stemming from the April 15, 2005 hearing. As we have previously held, "timely action after a trial court's final judgment is a jurisdictional prerequisite, and failure to conform with the applicable time limits results in forfeiture on appeal." Hatfield v. Edward J. DeBartolo Corp., 676 N.E.2d 395, 398 (Ind. Ct.App.1997), trans. denied.
Based on the foregoing, we conclude that Father failed to show that S.L.H.S. was an Indian child pursuant to the ICWA. Consequently, the ICWA does not apply to the underlying proceeding to terminate Father's paternal rights to S.L.H.S., and the trial court properly determined that it had jurisdiction to hear the case.

II. Evidentiary Rulings
Next, Father claims that the trial court erred in making certain evidentiary rulings during the termination fact-finding hearing.

A. Exclusion of Evidence
Father asserts that the trial court erred in excluding his testimony about a tribal membership card that allegedly belonged to a family member and therefore indicated his Native American heritage. The ECDCS argues that "[n]o offer of proof was made nor was the `card' offered into evidence. Even if this card had gone into evidence, the card was from the E-Chota nation which is not a federally recognized Indian tribe, and the ICWA would not have applied to it." Appellee's Br. at 21.
The admission of evidence is entrusted to the sound discretion of the trial court. In re P.W.J., 846 N.E.2d 752, 757 (Ind.Ct.App.2006). Thus, evidentiary rulings of a trial court are afforded great deference on appeal and are overturned only upon a showing of an abuse of discretion. In re H.R.M., 864 N.E.2d 442, 445 (Ind.Ct.App.2007). We will find an abuse of discretion if the trial court's decision is against the logic and the effect of the facts and circumstances before the court. P.W.J., 846 N.E.2d at 757.
This court has previously stated that a trial court "may consider only evidence that has been introduced and properly admitted." Mann v. Russell's Trailer Repair, Inc., 787 N.E.2d 922, 929 (Ind.Ct. App.2003), trans. denied. Additionally, Indiana Evidence Rule 901(a) provides that authentication is a condition precedent to admissibility of evidence. Thus, the trial court did not abuse its discretion in sustaining the ECDCS's objection to Father's testimony concerning the identification card, which had not been properly authenticated or offered into evidence.

B. Admission of State's Exhibits 13 and 14
Father next complains that the trial court erroneously admitted State's Exhibits 13 and 14 into evidence because the exhibits "had no nexus with the termination proceeding and were likely to have had a prejudicial impact on the judgment." Appellant's Br. at 34.
The admissibility of documents as exhibits is a matter within the discretion of the trial court and will be reversed only upon a showing of abuse of that discretion. Lahr v. State, 640 N.E.2d 756, 761 (Ind.Ct.App.1994), trans denied. Relevant evidence is defined as "evidence `having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" Davidson v. Bailey, *615 826 N.E.2d 80, 85 (Ind.Ct.App.2005) (citing Ind. Evidence Rule 401).
The record reveals that State's Exhibit 13 was a statement made by Father's niece, S.M., to Goshen Police officers on December 30, 1992, that Father had molested her when she was approximately five or six years old. State's Exhibit 14 was a report filed on the previous day, December 29, 1992, by then ten-year-old E.R., Father's former stepdaughter, indicating that Father had also repeatedly molested her. The record further reveals that both S.M. and E.R. testified during the termination hearing regarding the alleged molestations they suffered at the hands of Father, and both were subjected to cross-examination.
While the trial court is charged with the responsibility of evaluating a parent's fitness to parent at the time of the termination hearing, it must also take into consideration evidence of the parent's habitual patterns of conduct in determining whether there is a substantial probability of future neglect or deprivation of the child. McBride v. Monroe County Office of Family & Children, 798 N.E.2d 185, 199 (Ind.Ct.App.2003). Consequently, this court has held that evidence of a parent's prior involvement with the Department of Child Services, including the filing of previous CHINS petitions and previous termination proceedings, is admissible as proper character evidence and helpful in demonstrating negative habitual patterns of conduct to determine parental fitness and the best interests of the children. A.F. v. Marion County Office of Family & Children, 762 N.E.2d 1244, 1252 (Ind.Ct.App. 2002), trans. denied.
Based on the foregoing, we conclude that there was sufficient nexus between the underlying termination proceedings and the evidence admitted via State's Exhibits 13 and 14, and that this evidence of Father's past sexual misconduct was relevant in determining the probability of future parenting problems. The trial court therefore did not abuse its discretion by admitting State's Exhibits 13 and 14 into evidence.

III. Clear and Convincing Evidence
In his final argument to the court, Father asserts that the ECDCS failed to prove by clear and convincing evidence each element set forth in IC XX-XX-X-X(b)(2) as is required for the involuntary termination of parental rights.
Initially, we acknowledge that this court has long had a highly deferential standard of review in cases concerning the termination of parental rights. In re K.S., 750 N.E.2d 832, 836 (Ind.Ct.App.2001). Thus, when reviewing the trial court's judgment, we will not reweigh the evidence or judge the credibility of the witnesses. In re D.D., 804 N.E.2d 258, 264 (Ind.Ct.App. 2004), trans. denied. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. Id.
Here, the trial court made specific findings in ordering the termination of Father's parental rights. Where the trial court enters specific findings of fact, we apply a two-tiered standard of review. First, we must determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. Bester v. Lake County Office of Family of Children, 839 N.E.2d 143, 147 (Ind.2005). In deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. In re L.S., 717 N.E.2d 204, 208 (Ind.Ct.App. 1999), trans. denied; see also Bester, 839 N.E.2d at 147. A finding is clearly erroneous when there are no facts or inferences *616 drawn therefrom that support it. D.D., 804 N.E.2d at 264. A judgment is clearly erroneous only if the findings do not support the trial court's conclusions or the conclusions do not support the judgment thereon. Quillen v. Quillen, 671 N.E.2d 98, 102 (Ind. 1996).
"The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." In re M.B., 666 N.E.2d 73, 76 (Ind. Ct.App.1996), trans. denied. However, the juvenile court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding the termination. K.S., 750 N.E.2d at 837. Parental rights may be terminated when the parents are unable or unwilling to meet their parental responsibilities. Id. at 836.
In order to terminate a parent-child relationship, the State is required to allege and prove that:
(A) one (1) of the following exists:
* * *
(iii) after July 1, 1999, the child has been removed from the parent and has been under the supervision of a county office of family and children for at least fifteen (15) months of the most recent twenty-two (22) months;
* * *
(B) there is a reasonable probability that:
(i) the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied; or
(ii) the continuation of the parent-child relationship poses a threat to the well-being of the child;
(C) termination is in the best interests of the child; and
(D) there is a satisfactory plan for the care and treatment of the child.
IC XX-XX-X-X(b)(2) (1998 & Supp.2007). The State must establish each of these allegations by clear and convincing evidence. Egly v. Blackford County Dep't of Pub. Welfare, 592 N.E.2d 1232, 1234 (Ind. 1992).
Father does not challenge the fact that S.L.H.S. was removed from his care for more than fifteen of the most recent twenty-two months or that there is a satisfactory plan for the care and treatment of S.L.H.S., namely: adoption. However, he does challenge the evidence supporting the remaining factors set forth above.

A. Continuation of the Parent-Child Relationship Poses a Threat
Father first claims that the ECDCS failed to prove by clear and convincing evidence that continuation of the parent-child relationship poses a threat to S.L.H.S. Specifically, Father argues that "[t]he reasons the trial court listed . . . are either based on past events, unproven events, or events that do not relate to [Father] raising a son." Appellant's Br. at 47. He further asserted that the evidence indicating he was a threat to S.L.H.S. was "not based on his current ability to parent a child." Id. We disagree.
Initially, we note that IC XX-XX-X-X(b)(2)(B) is written in the disjunctive. Thus, it requires the trial court to find only one of the two requirements of subsection (B) by clear and convincing evidence. See L.S., 717 N.E.2d at 209. The trial court found that continuation of the parent-child relationship poses a threat to S.L.H.S.'s well-being.
Our review of the record reveals that the evidence supports the trial court's finding that Father's history with his other *617 children indicates a threat to S.L.H.S.'s well-being. Father has a history of substantiated sexual abuse with his former stepdaughter, E.R. Additionally, S.M., Father's niece, testified that Father had repeatedly molested her as a child. Case Manager Carrie Condor also testified regarding a substantiated case of medical neglect involving two of Father's children living in Florida.
Other evidence reveals that Father has serious psychological issues which, if left untreated, could interfere with his ability to provide a safe home environment for S.L.H.S. Dr. Jay Shetler, clinical psychologist, performed two psychological evaluations of Father. Dr. Shetler testified that he diagnosed Father with Delusional Disorder, a "severe and chronic mental illness [i]n the same category as Schizophrenia. . . ." Tr. at 221-22. He further testified that such a disorder could "certainly" interfere with a person's ability to parent a child and that Father's grandiose and persecutory delusions could result in Father making "very, very, very poor judgments[.]" Id. at 222-23.
Case manager Roger zum Felde testified that he felt reunification between Father and S.L.H.S. posed a continuing threat to S.L.H.S.'s safety and well-being because of Father's "unaddressed sexual molestation issues and those unaddressed psychological issues." Id. at 124, 127. Zum Felde further testified that as of the time of the termination hearing, Father had not been involved in counseling other than one or two sessions. Despite Father's serious psychological and pychosexual issues and substantiated allegations of sexual abuse, the record reveals that Father refused to admit he had a problem, and failed to complete any of the court-ordered counseling. When questioned at trial as to whether he felt he had any need for psychiatric counseling, Father responded, "No, sir, I don't." Id. at 392.
For all these reasons, we conclude that the ECDCS presented clear and convincing evidence that there is a reasonable probability that continuation of the parent-child relationship poses a threat to the well-being of S.L.H.S.

B. Best Interests of the Child
Father also makes the bald assertion, without cogent argument or citation to authority, that the trial court failed to indicate why termination was in the child's best interests. Specifically, Father argues that the court's findings "focus on [Father] rather than [S.L.H.S.]" and that the trial court's finding that Father was still unable to care for S.L.H.S. because to do so would be a threat to the well-being of the child "does not provide an adequate reason for termination." Appellant's Br. at 48.
We are mindful that in determining what is in the best interests of the child, the court is required to look beyond the factors identified by the Department of Child Services and look to the totality of the evidence. McBride, 798 N.E.2d at 203. In so doing, the trial court must subordinate the interests of the parent to those of the children. Id. Termination of a parent-child relationship is proper where the child's emotional and physical development is threatened. In re R.S., 774 N.E.2d 927, 930 (Ind.Ct.App.2002), trans. denied. The trial court need not wait until the child is irreversibly harmed such that his physical, mental, and social development is permanently impaired before terminating the parent-child relationship. Id.
Here, the record reveals that at the time of the termination hearing, Father had failed to complete court-ordered counseling services and sex offender specific treatment, had failed to exercise regular visitation with S.L.H.S., and had failed to *618 pay court-ordered child support for S.L.H.S. thereby accruing thousands of dollars in child support arrearages for not only S.L.H.S., but Father's other children as well. Additionally, Father was unemployed and refused to admit he had any psychological or psychosexual problems. The evidence further indicates that S.L.H.S. had been removed from his parents' home and had been under the care and supervision of the ECDCS for half of his life. Moreover, Court Appointed Special Advocate ("CASA") Kathy Stull testified that continuation of the parent-child relationship posed a threat to S.L.H.S.'s well-being, that termination of Father's parental rights was in S.L.H.S.'s best interest, and that S.L.H.S. needed permanency. Likewise, case manager Roger zum Felde testified in favor of termination, stating, "[S.L.H.S.] needs to have a permanent home. . . . He needs to be in a home for the rest of his life. Where he knows he'll be loved, protected, safe." Tr. at 127. Testimony from S.L.H.S.'s foster mother also indicates that S.L.H.S. is thriving in his current placement.
Based on the totality of the evidence, we conclude that the trial court's finding that termination was in S.L.H.S.'s best interests was supported by clear and convincing evidence. See McBride, 798 N.E.2d at 203 (concluding that testimony regarding a child's need for permanency, coupled with the fact that the children were thriving in their current foster home, supports a finding that termination is in the child's best interests); see also In re A.I., 825 N.E.2d 798, 811 (Ind.Ct.App.2005), trans. denied (stating that testimony of CASA and family case manager, coupled with evidence that conditions resulting in placement outside the home will not be remedied, is sufficient to prove by clear and convincing evidence that termination is in child's best interests).

C. Satisfactory Plan
Father's final assertion of error is that there was insufficient evidence supporting the trial court's finding that the ECDCS had a suitable plan for the care and treatment for S.L.H.S. In so doing, Father refers to S.L.H.S.'s alleged Native American heritage and suggests that, according to the ICWA, S.L.H.S. should be placed with a member of the child's extended family, other members of the Indian child's tribe, or other Indian family.
In order for the trial court to terminate the parent-child relationship, the court must find that there is a satisfactory plan for the care and treatment of the child. In re B.D.J., 728 N.E.2d 195, 204 (Ind.Ct.App.2000). This plan need not be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated. Id. Here, the ECDCS's plan was for S.L.H.S. to be adopted. Thus, the evidence supports the trial court's finding that the ECDCS had a satisfactory plan for the care and treatment of S.L.H.S. See D.D., 804 N.E.2d at 268 (concluding that State's plan for child to be adopted by current foster parents or another family constitutes suitable plan for child's future care). Additionally, as noted above, the trial court was not bound by the ICWA in determining the proper placement of S.L.H.S.
In sum, Father failed to show that S.L.H.S. was an "Indian child" pursuant to the ICWA. Consequently, the ICWA is inapplicable to the present case and the trial court properly determined that it had jurisdiction. Additionally, the trial court did not err by excluding Father's testimony concerning the identification card, which had not been properly authenticated or offered into evidence, or by allowing the admission of State's Exhibits 13 and 14. Finally, our review of the record leaves us *619 convinced that the trial court's judgment terminating Father's parental rights to S.L.H.S. was supported by clear and convincing evidence. The judgment is therefore affirmed.
Affirmed.
RILEY, J., and MAY, J., concur.
NOTES
[1] We commend the trial court for its meticulous and thoughtful findings that have greatly aided in our review of this case.
[2] Because Mother does not challenge the termination of her parental rights to S.L.H.S. and is not a party to this appeal, we will not elaborate on the court's orders made during the CHINS proceedings or the findings in its termination judgment pertaining to Mother.
[3] Because we have determined that the ICWA is inapplicable under the facts of this case, we need not address Father's additional contention that the trial court lacked jurisdiction because the ECDCS failed to follow proper notification procedures under the ICWA.
[4] Further analysis of this issue is not possible due to the fact Father failed to provide this court with a copy of his petition that precipitated the hearing held on April 15, 2005.