## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jul 24 2018, 10:27 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT-
FATHER

Rebecca L. Gray
The Law Offices of Rebecca Gray, LLC
Carmel, Indiana

ATTORNEY FOR APPELLANT-
MOTHER

Cara Schaefer Wieneke
Wieneke Law Office, LLC
Brooklyn, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

David E. Corey
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Termination of the Parent-Child Relationship of S.L., A.E., and D.E.; <br><br> C.E. (Father) and M.L. (Mother), <br><br> *Appellants-Respondents,* <br><br> v. <br><br> Indiana Department of Child Services, | July 24, 2018 <br><br> Court of Appeals Case No. 18A-JT-261 <br><br> Appeal from the Shelby Superior Court <br><br> The Honorable R. Kent Apsley, Judge <br><br> Trial Court Cause No. 73D01-1705-JT-4 73D01-1705-JT-5 73D01-1705-JT-6 |



*Appellee-Petitioner.*

**Najam, Judge.**

## Statement of the Case

C.E. ("Father") and M.L. ("Mother") (collectively "Parents") appeal the trial court's termination of their parental rights over their minor children A.E. and D.E., and Mother also appeals the termination of her parental rights over her minor child by another father, S.L.[1] Parents present the following issues for our review:

1. Whether the trial court erred when it concluded that the Indian Child Welfare Act does not apply to this proceeding.

2. Whether the State presented sufficient evidence to support the termination of Father's parental rights.

We affirm.

---

[1] S.L.'s father, S.B., does not participate in this appeal.

## Facts and Procedural History

[3] Mother gave birth to S.L. on October 5, 2011. Thereafter, Mother met and married Father, and they had two children together, A.E. and D.E., born in 2013 and 2015, respectively.[2] At some point prior to D.E.'s birth, Father, a foreign national, left the United States to live in Spain, but he remained married to Mother.

[4] On July 1, 2015, Mother sought emergency medical treatment because she "believed herself and [the C]hildren [to be] covered with bedbugs." Appellants' App. Vol. 2 at 64. After health care providers determined that Mother and the Children were *not* covered in bedbugs and were medically fine, Mother continued to insist that "bedbugs were crawling all over her and [the C]hildren." *Id.* Accordingly, the Indiana Department of Child Services ("DCS") took emergency custody of the Children and placed them in foster care. Thereafter, DCS filed petitions alleging that the Children were children in need of services ("CHINS"), and the trial court found the Children to be CHINS by order dated February 12, 2016. After Parents failed to fully comply with services, on May 1, 2017, DCS filed petitions to terminate their parental rights over A.E. and D.E., as well as a petition to terminate Mother's parental rights over S.L.

---

[2] For ease of discussion, we will refer to the three children, collectively, as "the Children." We will also, however, refer to A.E. and D.E. as "the Children" where our discussion is relevant only to them, as will be obvious from the context.

Following a hearing, the trial court granted the petitions on December 26, 2017. In support of its order, the trial court entered the following findings and conclusions:

9. Father . . . is a foreign national, educated from middle school through high school in the United States, but due to a violation of the United States law cannot return to the United States at this time or for the next seven and one-half (7 ½) years. He continues to be married to [M]other. . . .

10. Father . . . had left the United States prior to the beginning of the CHINS cases concerning [the C]hildren, and [he] is currently in Spain with no current possibility for return to the United States.

* * *

12. All three [C]hildren were in the custody and control of [M]other . . . on July 1, 2015[,] and were removed by DCS without court order on an emergency basis. A hearing was timely held on July 2, 2015. The Court found that the emergency removal and detention was necessary to protect the [C]hildren. The Court further found that on July 1, 2015[,] [M]other . . . was hysterical and believed herself and her [C]hildren were covered with bedbugs. She believed one of her children had a seizure due to the bedbugs digging into his skin and that the child had stopped breathing. When medics arrived the child was pink, warm and dry. No bedbugs or evidence of bedbugs was observed. Mother and the [C]hildren were examined at W.S. Major Hospital. There were no bite marks or any evidence of bedbugs. Mother stated that she was not crazy and continued to state that bedbugs were crawling all over her and her [C]hildren.

13. All three [C]hildren were detained by Court Order at the hearing held on July 2, 2015, [and they were] placed in foster care[,] where they remain.

14. Mother appeared with counsel on September 24, 2015[,] and admitted that her [C]hildren were CHINS.

15. The Court held a Dispositional Hearing on February 11, 2016[,] and issued a written order on February 12, 2016.

16. As a part of the Dispositional Order, [M]other was ordered to inpatient drug treatment and to contact her Family Case Manager every week.

17. Mother resisted all help from DCS and failed to visit [the C]hildren.

18. DCS attempted to provide visitation with the [C]hildren and [M]other from the day the [C]hildren were detained.

19. DCS provided transportation for [M]other to visit [the C]hildren, however [M]other repeatedly failed to visit [the C]hildren.

20. Father . . . remained married to [M]other and communicated with her by phone after his [C]hildren were detained.

21. Father . . . called the Family Case Manager on August 6, 2015[,] and again on August 7, 2015, asserting he was the father of two of the children. DCS asked him to confirm his identity and relationship with the children. In his conversation with the Case Manager, he was told of the next court date and he informed the Case Manager that his lawyer would be representing him at the hearing.

22.  Father . . . did attempt to send a [facsimile] to DCS with his identifying information, however, the photograph of his ID/passport was illegible.

23.  As of February 8, 2016, neither DCS nor the Court had any additional information concerning either father [S.B. or C.E.] and the Court authorized service on the fathers by publication.

24.  Fathers, [S.B. and C.E.], were defaulted at a hearing held May 12, 2016.

\* \* \*

27.  As of September 8, 2016, over a year since the [C]hildren were detained, [M]other had failed to participate in services. Mother, however at that time was in jail on an unrelated criminal matter and substance abuse treatment was provided to her while in jail and DCS arranged for inpatient treatment upon her release.

28.  The DCS Family Case Manager drove [Mother] to her inpatient treatment program and [M]other did complete the program.  However, [M]other failed to attend the first meeting after her release.  Mother also tested positive for methamphetamine upon her release from inpatient treatment and promptly relapsed.

29.  Services offered to [Mother] included:

a. Take Back Control (substance abuse);
b. Gallahue Community Mental Health Center;
c. Home-based case management;
d. Physical health/disease testing:
e. Three (3) referrals to in-patient substance abuse treatment, including Volunteers of America and Wheeler Mission;
f. Visitation services; and
g. Home-based services (including employment, housing).

30. Mother showed little interest in any services including visiting [the C]hildren since the beginning of the case. By the time of the termination hearing, [M]other had not visited [the C]hildren for [more than] a year. Service providers made multiple efforts to facilitate [M]other's visitation, including arrangements to pick up both [M]other and the [C]hildren and take them wherever [M]other wanted to go. When [Mother] would fail to be where she was supposed to be for pick up, the [C]hildren would become upset, screaming and crying. Providers attempted a "Visitation Contract," [and] they made up a visitation calendar. After twenty-three (23) missed visits, [Mother's] visitation ended.

31. [A.E. and D.E.] have spent the majority of their lives in foster care. Their CHINS cases have been going on for the majority of their young lives.

32. [A.E. and D.E.] no longer have any emotional attachment to their biological parents and view the foster placement as their parents. The older sibling, [A.E.], has no recollection of either of her biological parents. The younger child, [D.E.], has never met his biological father.

33. [S.L.] has now been in foster care for a third of her life.

* * *

36. Father . . . voluntarily left the country prior to the birth of his child[ D.E.] and has had no consistent contact with either of his [C]hildren since. When [Father] left the United States[,] the pregnant [Mother] and [S.L. and A.E.] could have gone with him, but all stayed behind. Since leaving the United States, [Father] has undertaken no legal or other action to attempt to reunite with his family. [Father] is not eligible to reenter the United States of America for seven and one-half (7 ½) more years.

37. Father . . . had actual knowledge that his [C]hildren had been detained by DCS and called DCS in August 2015 and informed DCS he would be appearing by counsel. However, he didn't appear by counsel until March 17, 2017.

38. Counsel for [F]ather . . . then withdrew several months later on July 12, 2017.

39. Father . . . notified the Court at a hearing held July 17, 2017[,] that he would be rehiring counsel. [Father]'s prior counsel did not reenter his appearance.

40. Despite evidence that [F]ather . . . and his family are financially well-off, [Father] never did hire counsel. The Court, sua sponte, appointed counsel at public expense to protect [Father]'s interest.

41. Despite this Court's order in the CHINS case that he have weekly contact with DCS,[3] Father . . . has failed to stay in contact with the CASA or his Family Case Manager.

* * *

43. Since the filing of the underlying CHINS case, [Father] has not communicated with [the C]hildren. No letter, no birthday or Christmas cards. [Father's] mother has on occasion expressed an interest in being involved in the [C]hildren's lives. The Court allowed the paternal grandmother to intervene in the underlying CHINS cases. Nevertheless, other than a visit, no substantial steps have been taken to become actively involved with the [C]hildren.

---

[3] Father notes, and DCS concedes, that the trial court did not order him to maintain weekly contact with DCS. But Father does not contend that this error requires reversal. We address below Father's general contentions regarding his contact with DCS.

44. On July 1, 2015, when these [C]hildren were detained,

a. Mother . . . was unable to provide the [C]hildren with the necessities of life and supervision due to her use of illegal drugs.

* * *

c. Father . . . had been out of the country prior to the birth of his youngest child and was unable to return due to his violation of his visa.

Two and one-half years later the situation remains virtually unchanged.

45. This matter was set for fact-finding hearing on the combined petitions for termination of parental rights on October 26, 2017. Mother . . . had actual notice of the termination hearing, but failed to show up for the hearing. The Court made arrangements for both fathers to appear telephonically for the hearing. . . . Father [C.E.] was present for a period of time telephonically, but the call "timed out" at some point. The Court set the matter for further hearing on the petitions to terminate the parental rights of [both fathers] in order to allow the fathers a fair opportunity to further participate and offer additional evidence and testimony. Sometime prior to the hearing Mother's counsel was able to locate [Mother] and managed to get her to the second hearing. [Both f]athers . . . did . . . participate in the November 14th hearing by telephone.

46. Despite not appearing for the original fact-finding hearing, the Court allowed Mother . . . to testify. For the first time in the history of any of the Termination of Parental Rights cases or the underlying [CHINS] cases, [M]other stated that she "recently learned from my grandmother I have Indian heritage . . . Cherokee . . . ." She testified she was not involved in any Native American tribe or tribal activity.

47.   The foster parents testified that they intend to adopt all three [C]hildren as the permanency plan for the children.

48.   The [C]hildren's Court Appointed Special Advocate [("CASA")] testified that termination of parental rights and adoption by the foster parents is in the best interest of the [C]hildren.   Further, [sic] that none of the parents have a significant relationship with their children.   The [C]hildren are strongly bonded with their foster family.

CONCLUSIONS OF LAW

* * *

3.   The Indian Child Welfare Act defines an "Indian child" as "any unmarried person who is under age eighteen and is either (1) a member of an Indian tribe or (2) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." (25 U.S.C. § 1903).   Under federal law, individual tribes have the right to determine eligibility, membership, or both.   However, in order for ICWA to apply, the child must be a member of, or eligible for membership in, a federally recognized tribe.   The child must be either:   (1) a member of an Indian tribe; or (2) eligible for membership AND is the biological child of a member of a tribe.

a. No tribal membership documents, evidence of tribal membership or membership eligibility was introduced.

b. The Indian Child Welfare Act has not [sic] applicability to this cause.

4.   The minor [C]hildren have been removed from Mother for at least six (6) months under the dispositional decree.

5.   The minor children have been removed from Mother and their respective Fathers and have been under the supervision of

the DCS for at least fifteen (15) of the most recent twenty-two (22) months at the time that DCS filed its Verified Petition for Involuntary Termination of Parental Rights.

6. There is a reasonable probability that the conditions that resulted in the minor children's removal will not be remedied.

7. The parents of these children are either unable or unwilling to meet their responsibilities as parents.

8. The minor children are not required to wait indefinitely for their parents to take some substantial step toward becoming a responsible parent. The children should not be required to wait any longer to enjoy the permanency that is essential to their development and overall well-being.

9. There is a reasonable probability that the reasons for placement outside the home of Mother and [both] Fathers will not be remedied.

10. There is a reasonable probability that the continuation of the parent-child relationship[s] poses a threat to the well-being of the minor children.

11. Termination of the parent child relationship[s] is in the best interests of the minor children.

12. DCS has a satisfactory plan for the care and treatment of the minor children, which is adoption by their current placement.

13. If any of the foregoing Conclusions of Law should be more properly denominated as Findings of Fact, then they are so denominated.

JUDGMENT

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED:  That DCS' petition for termination of Mother's parental rights is granted; and that the parent-child relationship[s] between the [C]hildren . . . and their Mother . . . is hereby terminated.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED:  That DCS' petition for termination of Father['s] . . . parental rights is granted; and that the parent-child relationship[s] between [A.E. and D.E.] and their Father, [C.E.] is hereby terminated. . . .

*Id.* at 63-70.  This appeal ensued.

# Discussion and Decision

### *Issue One:  Indian Child Welfare Act*

Mother's sole contention on appeal is that "the termination order is invalid and should be reversed" because "the court failed to comply with the notice requirement of the Indian Child Welfare Act."  Appellant Mother's Br. at 7-8.  In particular, Mother maintains that,

> [o]nce [she] testified that she had discovered information that Children may be of Indian ancestry, the court had "reason to know" Children were of Indian ancestry and was required [under federal law] . . . to ensure that DCS undertook due diligence to determine whether in fact the Children were eligible to be members of a certain Indian tribe.

*Id.* at 12.  We cannot agree.

[7] The Indian Child Welfare Act ("ICWA") was enacted "to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families[.]" 25 U.S.C.A. § 1902. A party who seeks to invoke a provision of the ICWA has the burden to show that the Act applies in the proceeding. *Thompson v. Elkhart Ofc. of Fam. and Child. (In re S.L.H.S.)*, 885 N.E.2d 603, 612 (Ind. Ct. App. 2008). Following an evidentiary hearing, the trial court concluded that the ICWA does not apply here. Thus, Mother appeals from a negative judgment, *see, e.g.*, *Romine v. Gagle*, 782 N.E.2d 369, 376 (Ind. Ct. App. 2003), *trans. denied*, and she must show that the evidence points unerringly to a conclusion different from that reached by the trial court, or that the judgment is contrary to law. *Wilder-Newland v. Kessinger*, 967 N.E.2d 558, 560 (Ind. Ct. App. 2012), *trans. denied*.

[8] Applicability of the ICWA depends on whether the proceeding involves an "Indian child," which is defined as "any unmarried person who is under the age of eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." 25 U.S.C. § 1903(4). Here, at the conclusion of the termination hearing, Mother testified that her "grandma" had recently told her that Mother has "Indian heritage," specifically that Mother has Cherokee heritage. Tr. at 161. And Mother testified that, accordingly, the Children have "Indian heritage," too. *Id.* But Mother also testified that her grandmother does not have any "involvement" with a Native American tribe, and there is no evidence

that Mother has ever identified as a Native American or has been involved with a Native American tribe in any way. *Id.* Thus, there is no evidence that either Mother or the Children are *members* of a Native American tribe or have any "tribal status." *See In re S.L.H.S.*, 885 N.E.2d at 613. Thus, Mother has failed to provide any evidence that the Children are Indian children within the purview of the ICWA, and we conclude that the ICWA did not apply to the proceedings to terminate Parents' parental rights to the Children. *See id.* (holding ICWA did not apply despite parents' allegations that they were members of Native American tribes where parents could not prove membership).

### Issue Two: Sufficiency of the Evidence

[9] We begin our review of this issue by acknowledging that "[t]he traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *Bailey v. Tippecanoe Div. of Fam. & Child. (In re M.B.)*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. However, a trial court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding a termination. *Schultz v. Porter Cty. Off. of Fam. & Child. (In re K.S.)*, 750 N.E.2d 832, 837 (Ind. Ct. App. 2001). Termination of a parent-child relationship is proper where a child's emotional and physical development is threatened. *Id.* Although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be

terminated when a parent is unable or unwilling to meet his or her parental responsibilities. *Id.* at 836.

[10] Before an involuntary termination of parental rights can occur in Indiana, DCS is required to allege and prove:

> (B) that one (1) of the following is true:
>
> > (i)  There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
> >
> > (ii)  There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> * * *
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2) (2018).  DCS's "burden of proof in termination of parental rights cases is one of 'clear and convincing evidence.'"  *R.Y. v. Ind. Dep't of Child Servs. (In re G.Y.)*, 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting I.C. § 31-37-14-2).

[11] When reviewing a termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses.  *Peterson v. Marion Cty. Off. of Fam. & Child. (In re D.D.)*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans.*

*denied*. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *Judy S. v. Noble Cty. Off. of Fam. & Child. (In re L.S.)*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*.

[12] Here, in terminating Parents' parental rights, the trial court entered specific findings of fact and conclusions thereon. When a trial court's judgment contains special findings and conclusions, we apply a two-tiered standard of review. *Bester v. Lake Cty. Off. of Fam. & Child.*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings and, second, we determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the trial court's decision, we must affirm. *In re L.S.*, 717 N.E.2d at 208.

[13] On appeal, Father contends that the trial court erred when it concluded that: the conditions that resulted in the Children's removal and the reasons for their placement outside of Mother's home will not be remedied; there is a reasonable probability that the continuation of the parent-child relationships poses a threat to the well-being of the Children; and termination is in the Children's best interests. Because the statute is written in the disjunctive, we need not address

the court's conclusion that continuation of the parent-child relationships poses a threat to the Children's well-being. I.C. § 31-35-2-4(b)(2).

### *Conditions that Resulted in the Children's Removal will not be Remedied*

In determining whether the evidence supports the trial court's finding that Father is unlikely to remedy the reasons for the Children's removal, we engage in a two-step analysis. *E.M. v. Ind. Dep't of Child Servs. (In re E.M.)*, 4 N.E.3d 636, 643 (Ind. 2014). "First, we identify the conditions that led to removal; and second, we determine whether there is a reasonable probability that those conditions will not be remedied." *Id.* (quotations and citations omitted). In the second step, the trial court must judge a parent's fitness to care for his children at the time of the termination hearing, taking into consideration evidence of changed conditions. *Id.* However, the court must also "evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child." *Moore v. Jasper Cty. Dep't of Child Servs.*, 894 N.E.2d 218, 226 (Ind. Ct. App. 2008) (quotations and citations omitted). Pursuant to this rule, courts have properly considered evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *Id.* Moreover, DCS is not required to rule out all possibilities of change; rather, it need establish only that there is a reasonable probability the parent's behavior will not change. *Id.*

Father contends that "many of the court's findings are erroneous," but he challenges only the following specific findings: that he failed to maintain contact with the Children, the CASA, and the family case manager, and that he

made no attempts to unify his family. Appellant Father's Br. at 12. In support of his contention on this issue, Father first states that "Mother was Father's sole source of communication with the [C]hildren. Once Mother ceased communicating with Father and changed her number, Father had no choice but to wait for Mother to call so that he could speak to his Children." Appellant Father's Br. at 13. The undisputed evidence shows that Mother stopped visiting the Children in March 2016, so Father has not spoken to the Children since then. And Father does not explain why he did not attempt to reach the Children by telephone through DCS or by petitioning the trial court for contact. Father does not suggest, and there is no evidence, that DCS would have thwarted his efforts to talk to the Children at any time.

[16] As for Father's inconsistent communication with DCS and the CASA, Father asserts that DCS did not let him know there was a problem with the identifying information he had provided by fax (it was illegible) in August 2015. Father testified that he called DCS "every day for a week" and then stopped calling and tried to hire a lawyer. Tr. at 145. Father testified that he did not contact DCS again after that time. And Father spoke to the CASA by telephone one time, only a few weeks prior to the final hearing. Finally, Father asserts that he attempted to reunify his family by buying plane tickets for Mother and the Children to travel to Spain. Father's arguments amount to a request that we reweigh the evidence, which we cannot do. Father ignores the evidence that: he has not seen either of his Children since before D.E. was born in 2015; he

has not sent his Children cards or letters; and he has not talked to them on the telephone since March 2016, at the latest.

[17] In any event, Father does not challenge the evidence supporting the trial court's conclusion that the reasons for the Children's removal from Mother's home will not be remedied. The Children were removed from Mother's care due to Mother's substance abuse and delusions about bedbugs crawling all over the Children. At that time, Father was not in the country, and, during the CHINS proceeding, Father made no efforts to take custody of the Children. At the time of the termination hearing, Mother had not visited the Children for over one year, she had failed to complete several court-ordered services, and she had not demonstrated sobriety. Father remained out of the country and had not taken meaningful steps to seek custody of the Children.

[18] Father's arguments on appeal simply seek to have this court disregard the evidence most favorable to the trial court's judgment and instead reweigh the evidence in his favor, which we cannot do. We cannot say that the trial court clearly erred when it concluded that the conditions that resulted in the Children's removal will not be remedied.

### Best Interests

[19] In determining whether termination of parental rights is in the best interests of a child, the trial court is required to look at the totality of the evidence. *A.S. v. Ind. Dep't. of Child Servs. (In re A.K.)*, 924 N.E.2d 212, 224 (Ind. Ct. App. 2010). "A parent's historical inability to provide adequate housing, stability and

supervision coupled with a current inability to provide the same will support a finding that termination of the parent-child relationship is in the child's best interests." *Castro v. State Off. of Fam. & Child.*, 842 N.E.2d 367, 374 (Ind. Ct. App. 2006), *trans. denied*. "Additionally, a child's need for permanency is an important consideration in determining the best interests of a child." *In re A.K.*, 924 N.E.2d at 224.

[20] Father contends that termination is not in the Children's best interests because he and Mother are "still married," and he has expressed "a willingness for Mother and [all three] Children to come to Spain to live" and "to help get Mother into substance abuse treatment[.]" Appellant Father's Br. at 18. Again, Father's contentions on this issue amount to nothing more than a request that we reweigh the evidence, which, again, we cannot do.

[21] The undisputed evidence shows that Mother had failed to participate in court-ordered services, failed to keep in contact with her family case managers, and failed to visit the Children for more than a year at the time of the termination hearing. Father has not seen the Children since before D.E.'s birth in 2015 and has not communicated with them since March 2016. Father's Children do not know him. The Children need consistent and reliable care, and they need permanency. The Children's CASA testified that removing the Children from their foster parents, the only parents they know, would be "traumatic." Tr. at 27. And the CASA testified that termination of Father's parental rights is in the Children's best interests. The totality of the evidence, including Father's historical inability to provide a safe and stable home for the Children and his

failure to maintain contact with the Children, supports the trial court's conclusion that termination of Father's parental rights is in the Children's best interests.

[22] Affirmed.

Crone, J., and Pyle, J., concur.