## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Sep 30 2019, 10:53 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Danielle Sheff
Sheff Law Office
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of L.B., I.B., O.B., and L.S., Minor Children Alleged to be Children In Need of Services; <br><br> D.B. (Mother), <br> *Appellant-Respondent,* <br><br> v. <br><br> Indiana Department of Child Services, <br> *Appellee-Petitioner,* <br><br> and <br><br> Child Advocates, Inc., | September 30, 2019 <br><br> Court of Appeals Case No. 19A-JC-681 <br><br> Appeal from the Marion Superior Court <br><br> The Honorable Marilyn A. Moores, Judge <br><br> The Honorable Gael S. Deppert, Magistrate <br><br> Trial Court Cause Nos. <br> 49D09-1811-JC-2747 <br> 49D09-1811-JC-2748 <br> 49D09-1811-JC-2749 <br> 49D09-1811-JC-2750 |

*Appellee-Guardian ad Litem.*

**Najam, Judge.**

# Statement of the Case

D.B. ("Mother") appeals the trial court's adjudication of her minor children L.B., I.B., O.B., and L.S. (collectively "Children"), as children in need of services ("CHINS"). Mother presents several issues for our review, which we consolidate and restate as the following three issues:

1. Whether the Indiana Department of Child Services ("DCS") presented sufficient evidence to support the trial court's adjudication of Children as CHINS.

2. Whether the trial court clearly erred when it ordered Mother to participate in certain services pursuant to the parental participation order.

3. Whether the trial court has jurisdiction over L.S. given his possible Native American heritage.

We affirm.

# Facts and Procedural History

Mother is the mother of L.B., born May 16, 2008; I.B., born September 21, 2009; O.B., born May 15, 2011; and L.S., born March 28, 2016. R.B. is the father of L.B. and O.B.; R.A.B. is the father of I.B.; and C.S. is the father of

L.S. Mother and C.S. have been in a romantic relationship for several years, and there have been multiple instances of domestic violence between them. In August and October 2018, "law enforcement responded to three (3) disturbances between [Mother] and [C.S.] that occurred with children present." Appellant's App. Vol. 3 at 111. In addition, on October 4, 2018, "a fourth disturbance . . . occurred where [Mother] reported [C.S.] held her against her will for fourteen (14) hours, threatened to kill her if she contacted police, assaulted her and then prevented her and [L.S.] from leaving the scene." *Id.* Accordingly, on October 5, Mother filed a petition for an order of protection against C.S., which the trial court granted.

[4] On October 22, at 2:55 a.m., C.S. "banged" on the door of Mother's home, and on October 29, Mother filed a petition for contempt against C.S. *Id.* at 112. The State subsequently charged C.S. with invasion of privacy for violating the order of protection. However, on November 5, Mother moved the trial court to dismiss the order of protection, which the trial court did.

[5] Due to the domestic violence between Mother and C.S. in the presence of Children, on November 9, DCS filed petitions alleging that Children were CHINS, and the trial court removed Children from Mother's care. On January 2, 3, and 4, 2019, and on February 27, the trial court held fact-finding hearings and a dispositional hearing. The court determined Children to be CHINS and found and concluded in part as follows:

10. [Mother] was earlier involved with DCS in 2003 or 2004, involving three (3) older children, two of whom she signed voluntary consents to adopt.

* * *

22. On 10/5/18, Indianapolis Metropolitan Police Department (IMPD) Officer Hibschman responded to a disturbance, close to midnight, where he saw [Mother] outside in her driveway by her vehicle, visibly upset, because her child's father, [C.S.], came over to argue with her. [Mother] told the officer that their son ([L.S.]) was present the night I was called there (on 10/5/18), and that [C.S.] left [Mother's] residence before IMPD arrived.

23. [Mother] also told Officer Hibschman that the day before, on 10/4/18, [C.S.] came to her home about 9:00 a.m, and held her hostage for fourteen (14) hours, leaving about 11:00 p.m. He would not let her call the police, or he would kill her. [Mother] then left for the hospital for injuries she said [C.S.] caused her when he assaulted her sometime during 10/4/18. After she left for the hospital, [C.S.] called [Mother] and told her he was returning to [Mother's] residence to get his son [L.S.], which caused [Mother] to interrupt her drive to the hospital and return to her residence for her son. Mother reported to Officer Hibschman that [C.S.] subsequently blocked her vehicle so that [Mother] could not leave with their son, [L.S.], who was buckled in the car. [Mother] reported that [C.S.] pushed her into the door jamb of the vehicle, causing her pain in addition to injuries she received earlier from him. [C.S.] then left the scene, with her extra set of car keys and house keys, before IMPD arrived. [Mother] informed Officer Hibschman she intended to obtain a protective order.

24. Officer Hibschman recalls that [Mother] told him the children were present 10/4/18.

25. Based on Officer Hibschman's undisputed testimony, [the] Court finds that on 10/4/18, [C.S.] held [Mother] hostage for fourteen (14) hours, threatened her with death if she contacted police, and caused her injuries and pain before he then prevented her from leaving the scene with the child [L.S.] buckled in the car that [Mother] was driving.

* * *

52. During this CHINS cause, above, and prior to fact-finding, DCS referred [Mother and C.S.] to Families First for a domestic violence assessment for each parent.

53. Families First counselor Stacey May assessed [C.S.] for about two (2) hours on or about 11/13/18 pursuant to a DCS referral through these CHINS causes. . . .

54. During the domestic violence assessment. . . [C.S.] acknowledged his behavior and took accountability for his actions where he slapped [Mother].

55. FCM permanency worker states that both [Mother and C.S.] are in domestic violence classes through a DCS referral, which classes are not completed.

56. [C.S.] informed the Guardian ad Litem that [C.S.] was upset with the allegations in this CHINS cause . . . because the petition omitted that [Mother] smacked him seven or eight times.

57. Testimony is conflicting regarding whether [C.S.] resides in [Mother's] home, or whether he only visits the home, to include visits at late hours when [Mother] and [R.B.] communicate by phone; [C.S.] states he moved out of [Mother's] residence the week prior to the fact-finding date of 1/2/19 because he is tired of stuff and [Mother] would not let (him) see the kids.

* * *

62. [Mother] is upset that these CHINS causes, above, have been opened, as she contacted police because she and [C.S.] had an argument and she was angry with [C.S.] [Mother] considers herself being honest for calling the police where [Mother] was the victim.

63. [Mother] has no recollection or memory of physical contact or physical violence or no actual physical violence between her and [C.S.]: ["]I call the police because I am mad at him.["]

64. [Mother] has not acknowledged to [the] Guardian ad Litem or the DCS FCM that domestic violence has occurred between her and [C.S.]

65. [Mother and C.S.] assert that they argue.

66. [Mother] testified that she does not remember any physical violence between her and [C.S.]: ["]We argue and that's about it.["]

67. [Mother and C.S.] have discussed with the Guardian ad Litem and other members of the Child Family Team that they are working on their relationship and that they plan to live together.

* * *

75. On 11/26/18, the children were placed in relative/kinship care with aunt-in-law Judy Stedman.

76. On or about 12/28/18, relative care provider and maternal aunt Judy Stedman requested immediate removal of the children, above, from her care, on the basis of [Mother's] harassing conduct toward Ms. Stedman.

77. The children remain removed from the care and custody of their parents at the time of the fact-finding.

[The] Court finds [Mother and C.S.] unable, or unwilling, to acknowledge ongoing domestic disturbances between themselves that occur in the presence of [the C]hildren. . . . There have been four (4) such disturbances in a period of two (2) months in 2018. . . . While [Mother] has called the police in three of the four instances, and she has also sought protective orders against [C.S.] since 2017, both of them continue to demonstrate judgment that seriously endangers the physical or mental condition of the children: Since 2017, [Mother] has successfully petitioned for multiple orders for protection against [C.S.], each of which she then sought to have dismissed, in periods of time ranging from 24 hours to no more than thirty (30) days since the issuance of the order. On 11/1/18, [C.S.] was criminally charged with invasion of privacy for violating an order for protection issued for [Mother], who sought to have that charge, and protective order, lifted, which the criminal court granted on 11/20/18, some 11 days since the filing of these CHINS allegations regarding domestic violence.

By [Mother's] testimony, she and [L.B., I.B., and O.B.] need therapy, in which they are each individually enrolled. Testimony was vague regarding the start dates of these therapy sessions. . . . Even if this judicial officer assumes the therapy sessions started a month or two prior to these CHINS actions, above, there remains significant concern about the willingness of [Mother and C.S.] to persist with both the services parents would need to address the impact upon their children of the domestic violence they perpetrate in the presence of these children, and also the therapy sessions in place for her and three of the children at the time of the fact-finding. Both [Mother and C.S.] minimize or deny the conflict and tension they create and in which these children live, and learn, as these children hear and observe the escalation and physical violence between [Mother and C.S.] on a continuing basis. Given [C.S.'s] denial to the domestic violence assessor, and given [Mother's] repeated efforts to obtain and then immediately withdraw her petitions for orders for protection, this

judicial officer is concerned that both of these parents would not voluntarily access domestic violence services to learn how to reduce if not eliminate the serious endangerment they put these children in by virtue of these parents' inability to manage conflict without resort to physical aggression in the presence of the children. Given that [Mother and C.S.] have stated their intent to be together, these children need these parents to complete the domestic violence classes already underway. Based on [C.S.'s] denial of any domestic disturbances, and on [Mother's] willingness to see dismissal of multiple orders for protection, this judicial officer finds the completion of recommendations from the domestic violence assessment unlike[ly] to be accepted by [Mother and C.S.] without the coercive intervention of the court.

* * *

CONCLUSIONS OF LAW

1. [L.B., I.B., O.B., and L.S.] is each a child under the age of 18 years.

2. The children's physical or mental condition is seriously impaired or endangered as a result of their parents' inability, refusal, and neglect to provide the children with a safe and stable home environment, free from exposure to domestic violence, and with adequate parental supervision and involvement.

3. The children need a safe and stable home environment, free from exposure to domestic violence, and with adequate parental supervision and involvement, which they are unlikely to receive without the coercive intervention of the Court.

Based upon the Findings and Conclusion[s], the Court now adjudicates the children to be Children In Need of Services.

*Id.* at 109-118.  This appeal ensued.

# Discussion and Decision

## *Issue One:  Sufficiency of the Evidence*

[6]     Mother first contends that there was insufficient evidence to sustain the trial court's determination that Children are CHINS.  Our Supreme Court recently reiterated our standard of review:

> When reviewing a trial court's CHINS determination, we do not reweigh evidence or judge witness credibility.  *In re S.D.*, 2 N.E.3d 1283, 1286 (Ind. 2014).  "Instead, we consider only the evidence that supports the trial court's decision and [the] reasonable inferences drawn therefrom."  *Id.* at 1287 (citation, brackets, and internal quotation marks omitted).  When a trial court supplements a CHINS judgment with findings of fact and conclusions of law, we apply a two-tiered standard of review.  We consider, first, "whether the evidence supports the findings" and, second, "whether the findings support the judgment."  *Id.* (citation omitted).  We will reverse a CHINS determination only if it was clearly erroneous.  *In re K.D.*, 962 N.E.2d 1249, 1253 (Ind. 2012).  A decision is clearly erroneous if the record facts do not support the findings or "if it applies the wrong legal standard to properly found facts."  *Yanoff v. Muncy*, 688 N.E.2d 1259, 1262 (Ind. 1997) (citation omitted).

*Gr. J. v. Ind. Dep't. of Child Servs. (In re D.J.)*, 68 N.E.3d 574, 577-78 (Ind. 2017) (alterations in original).

[7]     DCS alleged that Children are CHINS pursuant to Indiana Code Section 31-34-1-1 (2018), which provides that a child is a child in need of services if, before the child becomes eighteen years of age:  (1) the child's physical or mental

condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and (2) the child needs care, treatment, or rehabilitation that: (A) the child is not receiving; and (B) is unlikely to be provided or accepted without the coercive intervention of the court. Our Supreme Court has interpreted this provision to require "three basic elements: that the parent's actions or inactions have seriously endangered the child, that the child's needs are unmet, and (perhaps most critically) that those needs are unlikely to be met without State coercion." *J.B. v. Ind. Dep't. of Child. Serv. (In re S.D.)*, 2 N.E.3d 1283, 1287 (Ind. 2014).

[8] On appeal, Mother does not challenge any of the trial court's findings of fact that support the CHINS adjudication. Rather, she asserts generally that DCS' evidence was "so infected with innuendo and inconsistent testimony that it violates Due Process and Equal Protection and is patently insufficient to support the CHINS adjudication." Appellant's Br. at 36. First, we reject Mother's characterization of the evidence. Second, Mother does not demonstrate where in the record she preserved her Due Process and Equal Protection claims for appellate review.

[9] Third, and significantly, none of the evidence Mother challenges is relevant to any of the trial court's findings of fact. For instance, Mother's primary dispute on appeal focuses on DCS' "allegations of pervasive drug and alcohol use by [Mother], bipolar disorder and schizophrenia" which, she alleges, were

unsubstantiated. Appellant's Br. at 37. But not one of the trial court's findings or conclusions rests on the evidence presented in support of those allegations. Finally, Mother does not present cogent argument in support of her assertions that her constitutional rights have been violated. And it is undisputed that Mother "'had the opportunity to be heard at a meaningful time and in a meaningful manner'" in these proceedings, which is what due process requires. *See S.S. v. Ind. Dep't of Child Servs. (In re K.D.)*, 962 N.E.2d 1249, 1257 (Ind. 2012) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)).

[10] In any event, DCS presented sufficient evidence to support the CHINS adjudications. It is well settled that a child's exposure to domestic violence can support a CHINS adjudication under Indiana Code Section 31-34-1-1. *See N.L. v. Ind. Dep't. of Child. Serv. (In re N.E.)*, 919 N.E.2d 102, 106 (Ind. 2010); *see also M.P. v. Ind. Dep't. of Child. Serv. (In re D.P.)*, 72 N.E.3d 976, 984 (Ind. Ct. App. 2017) ("[A] single incident of domestic violence in a child's presence may support a CHINS finding, and [the violence] need not necessarily be repetitive."). Here, the trial court found, and Mother does not dispute, that

> [Mother and C.S. are] unable, or unwilling, to acknowledge ongoing domestic disturbances between themselves that occur in the presence of [C]hildren. . . . There have been four (4) such disturbances in a period of two (2) months in 2018, including one report by [Mother] that included [C.S.] threatening to kill her if she called the police, assaulting her during that 14[-]hour period and causing both injury and pain to her, and then blocking her car with [L.S.] in the car seat when she attempted to leave.

Appellant's App. Vol. 3 at 115.

Mother's contentions amount to a request that we reweigh the evidence, which we cannot do. The findings support the trial court's conclusions that the Children's physical or mental conditions are seriously impaired or endangered as a result of Mother's inability, refusal, and neglect to provide Children with a safe and stable home environment, free from exposure to domestic violence, and with adequate parental supervision and involvement and that Children need a safe and stable home environment, which they are unlikely to receive without the coercive intervention of the Court. We therefore hold that sufficient evidence supports the trial court's findings, and its findings support its conclusions with respect to Indiana Code Section 31-34-1-1. We affirm the trial court's adjudication of Children as CHINS.

### Issue Two: Dispositional Decree

Mother next contends that the trial court erred when it "ordered [her] to participate in services for which no evidence was presented at the CHINS proceedings." Appellant's Br. at 45. In particular, Mother asserts that there was no reason for the court to order her to participate in home-based services, which appears to relate to mental-health treatment, or to submit to random drug screens. We cannot agree.

Indiana Code Section 31-34-20-3 provides in relevant part that, if the trial court determines that a parent should participate in a program of care, treatment, or rehabilitation for the child, the court may order the parent to obtain assistance in fulfilling the obligations as a parent and to participate in a mental health or addiction treatment program. This court has held that, although the trial court

has "broad discretion in determining what programs and services in which a parent is required to participate, the requirements must relate to some behavior or circumstance that was revealed by the evidence." *M.C. v. Marion Cty. Dep't of Child Servs. (In re A.C.)*, 905 N.E.2d 456, 464 (Ind. Ct. App. 2009). Here, the trial court ordered in relevant part that Mother was required to participate "in a home-based case management program referred by the Family Case Manager and follow all recommendations" and to "submit to random drug/alcohol screens." Appellant's App. Vol. 4 at 35.

[14] First, on the issue of the home-based case management program, the trial court explicitly stated at the dispositional hearing that it would not be required for Mother unless indicated by the results of a psychological evaluation. Second, the trial court ordered drug screens based on the family case manager's testimony that, during the initial CHINS investigation in November 2018, Mother had reported substance abuse, and the court was concerned that her substance abuse might be contributing to the cycle of domestic violence. The court stated that if Mother tested negative, she would not have to undergo a substance abuse assessment or treatment. We hold that the evidence supports the trial court's orders.

### Issue Three: Indian Child Welfare Act

[15] Finally, Mother asks that we remand to the trial court to order DCS to determine whether L.S. "might fall under the auspices of the Indian Child Welfare Act." Appellant's Br. at 53. The Indian Child Welfare Act ("ICWA") was enacted "to protect the best interests of Indian children and to promote the

stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families[.]" 25 U.S.C.A. § 1902. A party who seeks to invoke a provision of the ICWA has the burden to show that the Act applies in the proceeding. *Thompson v. Elkhart Ofc. of Fam. and Child. (In re S.L.H.S.)*, 885 N.E.2d 603, 612 (Ind. Ct. App. 2008). Applicability of the ICWA depends on whether the proceeding involves an "Indian child," which is defined as "any unmarried person who is under the age of eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe *and* is the biological child of a member of an Indian tribe." 25 U.S.C. § 1903(4) (emphasis added).

[16] Here, Mother asserts that "[p]reliminary hearings in this matter . . . show that the [trial court] was presented with information that [C.S.] might be eligible for membership in the Cherokee Tribe[.]" Appellant's Br. at 53. Indeed, DCS filed a notice in compliance with the ICWA that a CHINS petition had been filed and that someone had alleged that C.S. may be eligible to be a member of an Indian tribe. However, Mother has not directed us to any evidence either that C.S. is a member or is eligible for membership in an Indian tribe or that his father is a member of a tribe. Without such evidence, Mother did not meet her burden to show that the ICWA applies, and she has not persuaded us that remand is necessary on this issue.

[17] Affirmed.

Bailey, J., and May, J., concur.